**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

**ZERO GRAVITY CORPORATION**                                         **PLAINTIFF**

**V.**                                                  **CASE NO.: 1:25-CV-00682-RAH-JTA**

**COMMERCIAL JET SERVICES, LLC**                                     **DEFENDANT**

**DEFENDANT COMMERCIAL JET SERVICES, LLC'S  VERIFIED EMERGENCY MOTION FOR ORDER PERMITTING RELOCATION OF AIRCRAFT AND REQUEST FOR EXPEDITED CONSIDERATION**

Defendant, Commercial Jet Services, LLC (herein "CJS"), by and through undersigned counsel, and pursuant to Federal Rules of Civil Procedure, and in compliance with the Court's Order [Doc. 31], files its Verified Emergency Motion for Relocation of the Aircraft and Request for Expedited Consideration expedited consideration:

**INTRODUCTION AND RELEVANT INFORMATION AND FACTS**

**I.       Plaintiff's Allegations in Its Second Amended Complaint**

Plaintiff, Zero Gravity, commenced this action against CJS seeking recovery for physical damage to its aircraft, a Boeing 727-200 (the "Aircraft"), that was allegedly caused by CJS, an aviation maintenance company.[1]  As background, Zero Gravity entered into a written contract with CJS to perform a comprehensive scheduled maintenance (referred to as a "C-check") on the Aircraft.[2]  On July 1, 2025, Zero Gravity released the Aircraft to CJS to perform the contracted C-check maintenance.[3]  During the C-check maintenance, CJS personnel allegedly caused damage to the Aircraft during a maintenance procedure called a pressurization check.[4]  Specifically, Zero

---

[1]      Second Amended Complaint [Doc. 39] at ¶¶ 6, 9, 15, and Prayer for Relief.
[2]      Second Amended Complaint [Doc. 39] at ¶¶ 9, 10.
[3]      Second Amended Complaint [Doc. 39] at ¶¶ 13, 14.
[4]      Second Amended Complaint [Doc. 39] at ¶¶ 15, 16, 19.

Gravity contends that the damage was caused by CJS's alleged improper installation of the APU exhaust duct and the use of a wooden block to support the APU exhaust duct, which allegedly resulted in hot gases escaping inside the wheel well of the Aircraft causing heat distress to panel inside the right wing.[5]

## II.    Relevant Background Information and Location of Alleged Damage Inside the Aircraft's Right-Wing Cavity

As background, CJS is a FAA certified maintenance and repair station with a business location on the Dothan Regional Airport.[6]  CJS performs its aircraft maintenance and repair work in its hangars.[7]  CJS utilizes its apron or ramp space (located outside the hangars) to park aircraft that are not actively under maintenance and repairs.[8]  Unlike a fixed base operator ("FBO") at an airport, CJS, a maintenance and repair station, does not use its hangar space to simply store aircraft. CJS's hangar and apron space are both secure locations at the airport, which means an individual must pass through security to gain access.[9]

The Aircraft is equipped with an Auxiliary Power Unit ("APU"), which is a small turbine engine that provides electrical power and pneumatic air during aircraft ground operations.[10]  The APU is located between the main wheel wells.[11]  The APU's hot gases created during operation, are removed from the Aircraft through an exhaust duct that runs from the APU into the right-wing cavity to an exhaust port in the top of the right wing (see, photographs below, on page 3).[12]

In early July 2025, CJS  was performing functional checks of the fuel feed lines as a part

---

[5]     Second Amended Complaint [Doc. 39] at ¶¶ 16-19.
[6]     See, Ex. A, Declaration of David Sandri at ¶ 3.
[7]     See, Ex. A, Declaration of David Sandri at ¶ 4.
[8]     See, Ex. A, Declaration of David Sandri at ¶ 5.
[9]     See, Ex. A, Declaration of David Sandri at ¶ 6.
[10]    See, Ex. B, Declaration of Eric Conroy at ¶ 3.
[11]    See, Ex. B, Declaration of Eric Conroy at ¶ 3.
[12]    See, Ex. B, Declaration of Eric Conroy at ¶ 3.

of its contracted work on the Aircraft.[13]   To gain access to a fuel probe located inside the right wing on the rear spar (panel) near the exhaust port, the APU exhaust duct was removed or displaced.[14]   To support the APU exhaust duct while it was displaced, CJS placed a wooden block inside the right wing on the lower skin underneath the APU exhaust duct. (See photographs below).[15]



| APU exhaust duct connected to Exhaust Port (red arrow) placement of wood block inside wing (green arrow) | Exhaust Port with APU Duct removed |
| --- | --- |

Upon completion of the inspection, APU exhaust duct was reconnected, but the wood block was not removed.[16]   During the subsequent APU run (i.e., the pressurization check), the wood

---

[13]     See, Ex. B, Declaration of Eric Conroy at ¶ 4.
[14]     See, Ex. B, Declaration of Eric Conroy at ¶ 4.
[15]     See, Ex. B, Declaration of Eric Conroy at ¶ 4.
[16]     See, Ex. B, Declaration of Eric Conroy at ¶ 5.

block was subjected to residual heat from the APU exhaust duct resulting in some form of combustion of the wood (e.g. smoldering).[17] The technicians detected a burning smell, observed the smoldering wood block, and removed the wood without the need of deploying any fire-retardant agents.[18] The inside section of the lower wing panel that was underneath the wood block was damaged – that is not contested in this case  (See photograph below, on page 4).



The contested issue, in this case, is that Zero-G claims that CJS caused heat damage to the upper portion of rear spar near the APU duct exhaust port – the area depicted in the right-side photograph on page 3, above (area around the greenish/yellow circle depicted in said photograph).[19]  CJS denies that the condition of this upper rear spar/panel is related to the wood-block combustion event that occurred on the inside floor/lower panel.  More importantly and relevant to CJS's requested relief, all of the alleged damage and physical evidence is located **INSIDE** the cavity of the Aircraft's right wing.  Thus, there is **NO risk** of spoliation of the physical evidence regardless of whether the Aircraft is located inside a hangar or outside on the apron/ramp.[20]

---

17      See, Ex. B, Declaration of Eric Conroy at ¶ 5.
18      See, Ex. B, Declaration of Eric Conroy at ¶ 5.
19      See, Ex. B, Declaration of Eric Conroy at ¶ 6.
20      See, Ex. B, Declaration of Eric Conroy at ¶ 6.

### III.    Continuous Business and Financial Harm to CJS to Store the Aircraft in a Hangar Requiring Urgent Court Intervention

On or about July 25, 2025, Zero Gravity paused or suspended the maintenance work on the Aircraft.[21]  A month later on August 25, 2025, Zero Gravity commenced this action against CJS. During this entire time period, approximately eight (8) months, the Aircraft (a large B727) has been stored in CJS's Hangar 15, which has prevented CJS from using the hangar space to perform scheduled maintenance and repair on its customers' aircraft.[22]  The Aircraft occupies more than twenty-five percent (25%) of usable space in the hangar.  CJS estimates that the cost of that hangar space is at least Five Hundred Dollars ($500.00) per day.[23]  For some perspective, the following is a list of some of the aircraft that require maintenance and repairs inside CJS's hangar that are or recently have been effected due to the unnecessary storage of the Aircraft inside Hangar 15: (1) Southwest Airlines, B737-700, N427NW; (2) Kalitta Charters, B737-300, N307GT; (3) Spirit Airlines, A320 NEO, N744NK; (4) Spirit Airlines, A320 NEO, N745NK; (5) Jackson Square Aviation, A320 NEO, N742NK; (6) Jackson Square Aviation, A320 NEO, N739NK; (7) Sky High Aviation, B737-700, NI1143; (8) Southwest Airlines, B737-700, N425LV; (9) Kalitta Charters, B737-400, N405CK; and (10) Cargo Aircraft Management, B767-300, N342CM.[24]

There is no legitimate reason why Plaintiff's Aircraft, which is not undergoing any maintenance or repairs, needs be stored  in CJS's Hangar 15, Bay 15-1; and due to its size, limiting the size of aircraft that can be worked on in adjacent Bay 15-4.[25]  In other words, the Aircraft is effectively occupying more than one-quarter of the space in Hanger 15 for storage, when it could

---

[21]    See, Ex. A, Declaration of David Sandri at ¶ 7.
[22]    See, Ex. A, Declaration of David Sandri at ¶ 8.
[23]    See, Ex. A, Declaration of David Sandri at ¶ 9.
[24]    See, Ex. A, Declaration of David Sandri at ¶ 10.
[25]    See, Ex. A, Declaration of David Sandri at ¶ 11.

be safely stored on the outside apron/ramp.[26]  Of note, typical fees charged for parking/storage, only (meaning an aircraft not scheduled for maintenance), of an aircraft the size of the Plaintiff's Aircraft is at least $1,500 per month.[27]

## AIRCRAFT RELOCATION ALLOWS FURTHER INSPECTIONS AND TESTING, AND POSES NO RISK OF EVIDENCE SPOLIATION OR AIRCRAFT DAMAGE

### I.    Any Further Inspection and Testing Can Be Performed with the Aircraft Parked on the Apron/Ramp

The parties have performed at least three (3) "rounds" of testing of the rear spar area to gather conductivity test data required by Boeing for the purpose of designing a reasonable repair solution.  The most recent testing was performed on or about February 4, 2026, by NDT Solutions, who were hired by Zero Gravity.  Below are a chart of the test results and an adjacent photograph from inside the right wing that corresponds to the testing area and results.



_____

[26]    See, Ex. A, Declaration of David Sandri at ¶ 12.
[27]    See, Ex. A, Declaration of David Sandri at ¶ 13.

6

At this time, the parties do not know whether or not additional testing will be requested by Boeing before the aircraft manufacturer's engineering department recommends a repair solution. It has been suggested by Zero Gravity that more testing is needed for the area locate in the "red box" depicted in the NDT Solutions chart and corresponding photograph, above on Page 6. If correct, the bracketry and duct in that area can be removed to facilitate the testing **without** the Aircraft being stored in the hangar.[28] Put differently, such minor disassembly in that small area **inside** the right wing **can be performed while the Aircraft is parked outside on the apron/ramp**.[29] The entire process of this minor disassembly and testing can be easily completed in one day, and undoubtedly does not require a removal of the wing.[30]

## II. Relocation of the Aircraft Poses NO Risk of Spoliation of Evidence or Damage to the Aircraft

At the risk of redundancy, the physical evidence is **inside** the cavity of the right wing. Prior to the Aircraft being moved from the hangar to the apron/ramp, the Aircraft will be sealed and water-tight; and thus, the **inside** of the right wing will not be exposed to the weather or any other condition that could possibly spoliate the evidence.[31] This is really just common sense as aircraft are routinely parked on outside ramps while not in service and obviously are exposed to the elements during normal ground and air operations. Thus, Zero Gravity's claim that moving the Aircraft "poses a serious risk of . . . destroying critical evidence relevant to this litigation" is incorrect and illogical, if not simply preposterous. (See, Plaintiff's Emergency Motion for Ex Parte Temporary Restraining Order [Doc. 28] at P. 2; Ex. B, Declaration of Conroy at ¶ 8).

---

[28] See, Ex. B, Declaration of Eric Conroy at ¶ 7.
[29] See, Ex. B, Declaration of Eric Conroy at ¶ 7.
[30] See, Ex. B, Declaration of Eric Conroy at ¶ 7.
[31] See, Ex. C, CJS's proposed Parties' Joint Agreed Order on the Protocol for Preservation of Aircraft at ¶¶ 2-4, 7; Ex. B, Declaration of Eric Conroy at ¶ 8.

Similarly, Zero Gravity's claim that moving the Aircraft "poses a serious risk of causing further irreparable harm to the Aircraft" is incorrect and illogical, and similarly preposterous. (See, Plaintiff's Emergency Motion for Ex Parte Temporary Restraining Order [Doc. 28] at P. 2; Ex. B, Declaration of Conroy at ¶ 8). The area inside the right wing at issue and as tested for any heat damage (i.e. damage being some degree of softening of the aluminum alloy that is used to manufacture the wing structure), as depicted in the NDT Solutions chart and photograph above on Page 6, is approximately thirty-six to thirty-nine inches (36" to 39") wide by fifteen inches (15") in height – compared to the length of the wing which is approximately one hundred eight feet (108') or three hundred twenty-four inches (324").[32]  In sum, there is **ZERO** risk that attaching an aircraft tug or tow tractor to the Aircraft's landing gear to push the Aircraft (on its wheels) outside the hangar and into a secure spot on the apron/ramp will cause **ANY** damage because of a minuscule area of the right wing may have some heat damage.[33] Again, this is common sense.

III.     **CJS Proposed to Zero Gravity a Reasonable Protocol for Preservation of the Aircraft for Relocation from the Hangar to the Secure Outside Apron/Ramp**

On March 16, 2026, CJS proposed a draft Parties' Joint Agreed Order on the Protocol for Preservation of Aircraft (See, Exhibit C).  In paragraphs 2 through 4, and 7, CJS details how it would prepare the Aircraft in an assembled, water-tight condition prior to moving the Aircraft from the hangar.  And, that CJS would periodically inspect the Aircraft to ensure that its water-tight condition remained unchanged.  The proposed protocol permitted Zero Gravity to be present during the entire process. (See, Ex. C at ¶ 10; Ex. B at ¶ 11).

The proposed protocol included provisions for additional testing that could be performed, if even necessary, while the Aircraft was parked on the apron/ramp. (See, Ex. C at ¶¶ 8, 11; Ex. B

---

[32]     See, Ex. B, Declaration of Eric Conroy at ¶ 9.
[33]     See, Ex. B, Declaration of Eric Conroy at ¶ 10.

at ¶ 12).  It also provided for the preservation of any parts that were previously removed from the Aircraft during maintenance. (See, Ex. C at ¶ 5).   Finally, once the Aircraft is ready to resume maintenance and repairs, CJS would work the Aircraft into its maintenance schedule and return the Aircraft to the hangar for such work. (See, Ex. C at ¶ 12).

CJS's proposed protocol was fundamentally rejected by Zero Gravity.  Plaintiff's counter-proposal required a "status quo must be maintained to allow the damage assessment to be completed before the aircraft is moved." The parties have had several "meet and confer" discussions with no resolution, as  Zero Gravity is unwilling to entertain the moving of the Aircraft from the hangar.

As previously discussed, Zero Gravity's possession is untenable and unsupported.  Zero Gravity simply wants its Aircraft to continue being stored in CJS's maintenance Hangar for no reasonable reason.  The Aircraft can be safely moved to the outside apron where every other aircraft that is not undergoing maintenance is parked.  The apron is in a secure area of the airport. The Aircraft will not sustain any damage by virtue of being outside.  The physical evidence, which is inside the right wing, will be preserved.  There is no risk of spoliation. And once the Aircraft is ready to resume maintenance, it will be returned to the hangar for such work. (See, Ex. B at ¶ 13).

Finally, to the extent that it is determined that the Aircraft should remain in the hangar, CJS requests that it should <u>not</u> be required to bear the whole cost of preserving the "status quo." To be clear, CJS expressly denies that it is in any way responsible for any damage to the rear spar area in the right wing – the area depicted in the photographs, above in Pages 3 and 6.

## CERTIFICATE OF GOOD FAITH

Defendant, the movant, certifies that counsel for the parties, in good faith, have met and conferred on several occasions with the most recent meetings being held on Friday, March 27,

2026 (attorneys S. Maples, S. Cusson, J. Banks, and D. Wagner in attendance) and on Monday, March 30, 2026 (attorneys S. Cusson and D. Wagner in attendance); and can advise this Court that the parties have been unable to come to an agreement on the relief requested in this Motion.

For all the foregoing reasons, Defendant, CJS, respectfully requests that this Court grant its Verified Emergency Motion for Relocation of the Aircraft and Request for Expedited Consideration, and such other relief it deems just and proper under the circumstances.

Respectfully submitted, this 1st day of April 2026.

> **COMMERCIAL JET SERVICES, LLC, DEFENDANT**
>
> BY:  */s/James L. Banks IV*
> James L. Banks IV (BAN028)
>
> *Attorney for Commercial Jet Services, LLC*

OF COUNSEL:

FORMAN WATKINS & KRUTZ LLP
210 E. Capitol Street, Suite 2200
Jackson, Mississippi 39201-2375
Post Office Box 22608
Jackson, Mississippi 39225-2608
O: 601-960-7834
F: 601-960-8613
jake.banks@formanwatkins.com

David A. Wagner (FL Bar# 102611) *admitted pro hac vice*
CLYDE & CO US LLP
1221 Brickell Avenue, Suite 1600
Miami, Florida 33131
O: 305-446-2646
F: 305-441-2374
david.wagner@clydeco.us

## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that on April 1, 2026, undersigned counsel electronically filed the foregoing document with the Clerk of Courts using CM/ECF which will send notification of such filing to: Thompson Burton PLLC, counsel for Plaintiff, Carson T. Perreault, Esq., Stuart M. Maples, Esq., Sean Cusson, Esq., 200 Clinton Avenue, W, Suite 1000, Huntsville, AL 35801.

<div style="margin-left:50%">

**COMMERCIAL JET SERVICES, LLC, DEFENDANT**

BY: /s/*James L. Banks IV*
James L. Banks IV (BAN028)

*Attorney for Commercial Jet Services, LLC.*

</div>